**Lansing, Michigan**

# Opinion

Chief Justice:

Robert P. Young, Jr.

Justices:

Michael F. Cavanagh
Marilyn Kelly
Stephen J. Markman
Diane M. Hathaway
Mary Beth Kelly
Brian K. Zahra

FILED JANUARY 27, 2012

STATE OF MICHIGAN

SUPREME COURT

*In re* Honorable JAMES M. JUSTIN
Judge, 12th District Court.

No. 142076

BEFORE THE ENTIRE BENCH

YOUNG, C.J.

The Judicial Tenure Commission (JTC) has recommended that this Court remove respondent, 12th District Court Judge James Justin, from office for numerous instances of documented judicial misconduct. Respondent's multitudinous acts of proved misconduct sketch a common theme: respondent failed to follow the law, apparently believing that it simply did not apply to him.

Instances of respondent's judicial misconduct include "fixing" (personally and surreptitiously dismissing) traffic citations issued to himself, his spouse, and his staff; preventing the transmission of or altering court information that was legally required to

have been transmitted to the Secretary of State;[1] dismissing cases without conducting hearings or involving the prosecutor; failing to follow plea agreements; and making false statements under oath during the JTC hearing.

In this case, respondent's fixing of traffic tickets issued to himself, his family, and staff *alone* warrants the most severe of sanctions. However, respondent's substantiated misconduct is much more extensive. The duration, scope, and sheer number of respondent's substantiated acts of misconduct are without precedent in Michigan judicial disciplinary cases. Respondent's long-term pattern of judicial misconduct constitutes a negation of the proper exercise of judicial authority that more than justifies the sanction imposed.

We order respondent's removal from office. Moreover, we order the JTC to submit a bill of costs, itemizing what portion of the costs may be attributed to the conduct or statements of respondent that give rise to liability for the payment of "costs, fees, and expenses incurred by the [JTC] in prosecuting the complaint . . . ." MCR 9.205(B).

I

On November 12, 2010, the JTC filed Formal Complaint No. 87 against Judge Justin,[2] alleging that he had committed judicial misconduct in violation of Const 1963, art

---

[1] Pursuant to MCL 257.732, courts are required to forward an "abstract," or synopsis, of a person's court record to the Secretary of State for violations of the Michigan Vehicle Code, MCL 257.1 *et seq.*, specified statutory violations, and corresponding local ordinance violations. "The failure, refusal, or neglect of a person to comply with" the requirements of MCL 257.732 "constitutes misconduct in office and is grounds for removal from office." MCL 257.732(14).

[2] An amended formal complaint was filed on January 24, 2011.

2

6, § 30;[3] MCR 9.104(1), (2), and (4)[4] and MCR 9.205;[5] and Canons 1,[6] 2(A) through (C),[7] and 3(A)(1),[8] (4), and (5)[9] of the Michigan Code of Judicial Conduct. The complaint alleged eight counts of misconduct.

---

[3] Const 1963, art 6, § 30(2) states in part:

> On recommendation of the judicial tenure commission, the supreme court may censure, suspend with or without salary, retire or remove a judge for . . . misconduct in office . . . or conduct that is clearly prejudicial to the administration of justice.

[4] MCR 9.104 states in part:

> (A) The following acts or omissions by an attorney, individually or in concert with another person, are misconduct and grounds for discipline, whether or not occurring in the course of an attorney-client relationship:
>
> (1) conduct prejudicial to the proper administration of justice;
>
> (2) conduct that exposes the legal profession or the courts to obloquy, contempt, censure, or reproach;
>
> * * *
>
> (4) conduct that violates the standards or rules of professional responsibility adopted by the Supreme Court[.]

[5] MCR 9.205 states in part:

> (A) Responsibility of Judge. A judge is personally responsible for the judge's own behavior and for the proper conduct and administration of the court in which the judge presides.
>
> (B) Grounds for Action. A judge is subject to censure, suspension with or without pay, retirement, or removal for . . . misconduct in office . . . or conduct that is clearly prejudicial to the administration of justice. . . .
>
> (1) Misconduct in office includes, but is not limited to:
>
> (a) persistent incompetence in the performance of judicial duties;

3

(b) persistent neglect in the timely performance of judicial duties;

(c) persistent failure to treat persons fairly and courteously;

(d) treatment of a person unfairly or discourteously because of the person's race, gender, or other protected personal characteristic;

(e) misuse of judicial office for personal advantage or gain, or for the advantage or gain of another; and

(f) failure to cooperate with a reasonable request made by the [JTC] in its investigation of a judge.

[6] Code of Judicial Conduct, Canon 1 states in part:

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. A judge should always be aware that the judicial system is for the benefit of the litigant and the public, not the judiciary.

[7] Code of Judicial Conduct, Canon 2 states in part:

A. Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. . . .

B. A judge should respect and observe the law. At all times, the conduct and manner of a judge should promote public confidence in the integrity and impartiality of the judiciary. Without regard to a person's race, gender, or other protected personal characteristic, a judge should treat every person fairly, with courtesy and respect.

C. A judge should not allow family, social, or other relationships to influence judicial conduct or judgment. A judge should not use the prestige of office to advance personal business interests or those of others.

4

## A. THE FINDINGS OF THE MASTER

On November 29, 2010, this Court appointed the Honorable Pamela J. McCabe as master to hear the case. The master's report, filed on March 24, 2011, concluded that seven of the eight counts of judicial misconduct alleged in the amended complaint had been proved by a preponderance of the evidence. The allegations and the relevant findings of fact are as follows.

### COUNT 1: INAPPROPRIATE DISMISSAL OF CASES

The first count of the complaint alleged that respondent had dismissed cases and inappropriately disposed of cases without holding hearings and without notice to or the authorization of the prosecuting attorney. Perhaps most significant, the master found that this count had been proved and included respondent's admission that he dismissed four

---

[8] The alleged violations of Canon 3(A)(1) included, but were expressly not limited to, violations of MCL 257.732; MCL 257.328; MCL 257.907; MCL 769.1(f); MCL 769.6; MCL 771.1(2); MCL 772.1 *et seq.*; and MCL 780.621.

[9] Code of Judicial Conduct, Canon 3(A) provides in part:

> (1) A judge should be faithful to the law and maintain professional competence in it. . . .
>
> * * *
>
> (4) A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding . . . .
>
> * * *
>
> (5) A judge should dispose promptly of the business of the court.

5

citations issued to himself,[10] five citations issued to his wife,[11] and citations issued to his court officer and court reporter.[12] All the tickets had been dismissed "after explanation," but without a hearing or advising the prosecutor.

Beyond concluding that respondent had fixed tickets for himself, his wife, and his staff, the master also concluded that respondent had engaged in a pattern of favoritism and "conferred favored status on many who came before him." The master's report cited two illustrations of respondent's pattern of leniency and favoritism.[13] The master also

---

[10] The master noted that respondent claimed to have a defense to his parking citations: that someone else was driving his vehicle. Moreover, respondent "expressed no regret" about fixing his own tickets.

[11] Respondent's wife had received three speeding tickets, a citation for having defective equipment, and a citation for disobeying a stop sign. The five citations were issued between November 2000 and October 2009.

[12] Each staff member had received a citation for speeding.

[13] The first instance involved a defendant by the last name of Wilson. In 2005, Wilson pleaded guilty to two counts of driving without a license and violations of child-restraint requirements. When she failed to pay the fines and costs, a bench warrant was issued by another judge of the 12th District Court. In February 2008, respondent set aside the guilty pleas and, contrary to law, removed the abstracts of conviction from the court's computer system. That same month, Wilson pleaded guilty to seven counts of driving without a license. While those cases were pending, Wilson accumulated three additional violations of driving without a license, as well as other civil infractions and a misdemeanor. The master noted that Wilson pleaded guilty to 10 counts of driving without a license, but respondent waived all the fines and costs and stopped all 10 abstracts from being sent to the Secretary of State, resulting in Wilson's avoiding the fees required by MCL 257.732a. The master further noted that respondent had stopped all the abstracts and waived the fines and costs without notice to the prosecutor.

The second instance of favoritism involved a defendant named Wheeler, who had pleaded guilty in 2009 to failing to file a 2005 tax return. In addition to paying her tax liability, Wheeler paid $125 in fines and costs. Afterward, Wheeler's mother wrote a letter to respondent, complaining of the "grave injustice" done to her daughter as a result

found that at the hearing, the examiner had proved "many cases" in which respondent dismissed charges or dismissed cases without the knowledge or approval of the prosecutor. The master noted that this was often done at the arraignment, when the prosecutor was not present. The master cited two examples in support of her conclusion.[14] As one might expect when a judge refuses to allow one party to know about, much less participate in, a judicial proceeding, the master rejected respondent's claims that he only dismissed cases if a "dismissal was inevitable" and that he only dismissed citations when presented "with solid evidence justifying such action."

COUNT 2: COURT RECORD ABSTRACTS

The second count of the complaint, which the master concluded had been proved by a preponderance of the evidence, alleged that respondent had improperly altered, deleted, or stopped summaries of court records from being transmitted to the Secretary of State as required by MCL 257.732. The master found that respondent had entered or caused to be entered false information into the court's judicial information system,

_____

of the fines and costs. Five months after Wheeler pleaded guilty, respondent set aside the guilty plea, dismissed the case, and returned the fines and costs, all without notice to the city of Jackson. In correspondence sent to Wheeler and her mother, respondent indicated that the "file should not have been opened" and that the "city doesn't deserve any fines and costs as a result of the opening of the file."

[14] In the first case, a defendant named Brown had been charged with two crimes. Respondent dismissed one count, and Brown pleaded guilty to the other. The township's attorney "was unaware of the case and had no knowledge of the dismissed charges."

In the second case, a defendant named Ross had received two citations for having no proof of insurance and expired plates. Respondent dismissed the charges outright, concluding that the "police were improperly stopping citizens for brake light violations." The dismissal of the case was done without notice to the prosecutor or a hearing.

7

causing the cancellation of the abstracts.[15] Additionally, the master found that respondent had engaged in a pattern of dismissing, in violation of the law, tickets that may properly be dismissed under certain circumstances[16] and removed court record abstracts for such tickets in violation of the law.[17] The master rejected respondent's claim that he "always saw proof of insurance" before dismissing those tickets. In addition to the fact that most of the cases presented were dismissed off the record, the master identified two specific instances indicating that proof of insurance had not, in fact, always been provided before tickets were dismissed.[18]

---

[15] Respondent admitted that he would cancel an abstract properly sent to the Secretary of State by indicating that the previously transmitted abstract had been "sent in error." However, no error existed. Respondent simply wanted "the defendant to get his license turned around" and avoid the imposition of sanctions by the Secretary of State.

[16] When a motorist receives a citation for having no proof of insurance, fines and costs may not be assessed and an abstract may not be forwarded to the Secretary of State if, *before* the appearance date on the citation, the motorist submits proof to the court that the motor vehicle was insured at the time the violation occurred. MCL 257.328(3) (emphasis added). When a motorist receives a citation for defective equipment, a court is required to waive the "fine, costs, and assessments" if it receives certification "by a law enforcement agency" that the defective equipment was repaired "*before* the appearance date on the citation." MCL 257.907(9) (emphasis added). The allegations established that, contrary to law, respondent had dismissed tickets for both no proof of insurance and defective equipment *well after* the appearance date on the citation.

[17] MCL 257.328(3)(b) requires that a court "not cause an abstract of the court record to be forwarded to the secretary of state" if a motorist provides proof that the vehicle was insured at the time of the violation "*before* the appearance date on the citation." (Emphasis added.) The allegations established that, contrary to law, respondent caused court record summaries to be removed well after the appearance date on the citation.

[18] In the first case, a defendant named Smith defaulted on a citation for no proof of insurance in November 2006. In July 2008, 20 months *after* Smith had defaulted, respondent "removed the abstract with no proof of insurance produced." In the second case, a defendant named Stacey defaulted on a citation for having no proof of insurance that had been issued in March 2009. Respondent testified that he removed the abstract in

8

The master also found that respondent had prevented court record abstracts from being transmitted to the Secretary of State or caused abstracts to be deleted in violation of the law. In 2007, the chief judge of the 12th District Court became aware that respondent had deleted an abstract and discussed this with respondent. Respondent admitted that he had mistakenly deleted the abstract. The chief judge told respondent to discontinue this practice. However, because respondent continued the practice of stopping or deleting court record abstracts, the chief judge removed respondent's authority to directly access the relevant portion of the court's computer system in 2009. The master found that respondent, undeterred, used others to continue this practice: respondent "sent 'stacks' of notes to his court clerk" ordering her to "stop abstracts in cases which should be properly abstracted." In fact, respondent acknowledged that he had caused court record abstracts to be stopped in order to "avoid further suspension" of a defendant's driving privileges. The master found that respondent "stopped multiple convictions for the same defendant, deleted abstracts years after conviction, and for cases assigned to other judges." Moreover, the master concluded that respondent's act of directly stopping abstracts and ordering his clerk to do the same violated the law.

COUNT 3: EX PARTE COMMUNICATIONS

The master found that the third count of the complaint had been proved by a preponderance of the evidence because respondent had "engaged in ex parte communications with defendants that resulted in dismissal of cases" in violation of

September 2009 and waived the fines and costs because the "vehicle was insured." However, Stacey acknowledged on the record that her automobile was not insured at the time the citation was issued.

9

Canon 3(A)(4). The master noted several cases in support of her conclusion, including ex parte communications between respondent and his wife before he dismissed her five tickets, as well as ex parte communications between respondent and his staff members before dismissing their tickets. The master also cited respondent's communications with Roscina Ragland, as described later in the discussion of count seven, and respondent's ex parte communications with a woman named Jaime Chapman.[19] The master indicated that respondent admitted having dismissed cases after "discussing the matters in the hallway" without the involvement of the prosecuting attorney because doing so provided "optimum, convenient service."

### COUNT 4: FAILURE TO FOLLOW PLEA AGREEMENTS

The master found that the fourth count of the complaint had been proved by a preponderance of the evidence because respondent had failed to follow plea agreements between the prosecuting attorney and defendants without advising the prosecutor. Respondent admitted that he had dismissed or reduced charges without the prosecutor's authorization after the defendant and prosecutor had reached a plea agreement.[20] In other

---

[19] In April 2010, respondent was observed talking with Chapman about her traffic tickets in the hallway of the courthouse. Subsequently, respondent went to the clerk's office and asked the staff to "make amendments to the charges." Respondent dismissed Chapman's ticket for no proof of insurance, and Chapman pleaded guilty to having expired plates. The staff member testified that she did not observe any proof of insurance and that Chapman was "very grateful" and thanked respondent several times.

[20] One illustration the master cited involved a defendant named Goolsby, who had been issued citations for driving with a suspended license and defective equipment. According to the terms of the negotiated agreement, the case was to be adjourned for eight weeks so that Goolsby could get his license reinstated. If he was successful, the original charges would be dismissed and Goolsby would be permitted to plead guilty to two counts of having improper license plates and pay $50 in costs for each count. However, respondent

10

instances, respondent refused to order that a defendant pay the costs of prosecution after the defendant specifically agreed to pay those costs as part of a negotiated plea agreement. The master noted that respondent did not order costs in "most of the cases" the examiner presented to the master. While respondent claimed that he did not order payment of the costs of prosecution because "it would have been illegal to assess them," the master rejected this rationalization because respondent's pattern of cost imposition did not correlate to its legality.[21] By respondent's admission, he ordered costs when there was no statutory authority to do so and failed to order them when the law expressly allowed it.[22] Rather than legal authority being the pivotal consideration in deciding whether costs would be imposed, the master found that there was "no philosophical or legal basis" underlying the imposition of costs. "The standard for respondent seemed to be whether the defendant could pay, whether there would be any money to the court" after costs were paid, and whether the defendant received a favorable plea bargain from the prosecutor.

_____

accepted a guilty plea to one count of improper plates, dismissed the other count entirely, and did not order costs. The master also cited a similar case involving a defendant named Cramer.

[21] The master also noted that several witnesses testified that, at the time costs were sought in conjunction with plea agreements, respondent never indicated that he believed that the imposition of costs was illegal.

[22] The master cited 31 cases in which respondent did not order a defendant to pay the costs of prosecution in drunk driving cases although the law permitted it, 35 cases in which respondent failed to order costs per the plea agreement, and 35 cases in which respondent ordered a defendant to pay costs despite the lack of legal authority to do so.

COUNT 5: INAPPROPRIATE DELAYS

The master found that the fifth count of the complaint had been proved by a preponderance of the evidence because respondent had "failed to promptly dispose of the business of the court," resulting in "dozens of cases" that were "pending for years."[23] The master also noted several cases that had been serially adjourned and left open for extended periods until the defendants complied with special bond conditions imposed by respondent, including writing book reports, getting a driver's license restored, or getting an A in math. Respondent's continued adjournments and delays resulted in "chaos" for the court staff, difficulty tracking files, and larger caseloads. The master found that after numerous adjournments and delays, some defendants "eventually failed to appear" to court and were arrested and imprisoned without bond as a consequence.[24] The master noted that while these cases were delayed, defendants frequently committed new offenses, which were "oftentimes disposed of with no penalty."

---

[23] One such case the master discussed involved a defendant named Wicks who was arraigned in 2001 for two misdemeanor offenses. As of 2010, Wicks's 2001 file remained open because he had failed to comply with the terms of his sentence. While on probation, Wicks pleaded guilty to an offense in 2004. Respondent stopped the court record abstract from being transmitted to the Secretary of State and adjourned the case "approximately 40 times" until June 2010, at which point the file was closed and fines and costs were waived.

[24] The master noted one example involving a minor who had been charged in June 2007 with being in possession of alcohol, an offense that does not permit the imposition of a jail sentence. See MCL 436.1703(1)(a). The case was adjourned 37 times, requiring the defendant to make numerous appearances in court. Ultimately, the defendant was jailed on a bench warrant for failing to appear. The case was eventually resolved in July 2010 by a different judge of the 12th District Court.

The master rejected respondent's claim that the excessive delays were proper because he had the authority to delay sentencing for one year[25] and could place a defendant on probation for up to two years.[26] Respondent claimed that he had the authority to delay a defendant's sentencing for as long as four years. The master found that respondent's claim was "disingenuous" and "appear[ed] to be made up after the fact."[27] The master also rejected respondent's claim that extended delays were comparable to a specialty court and that cases were delayed for "prolonged periods" for "salutary purposes." Rather, the master concluded that "[i]t was respondent's practice to hold defendants for unspecified periods of time, unsentenced, for completion of tasks that did not necessarily address the offense for which the defendants were being sentenced."

## COUNT 6: PEACE BONDS

The master found that the sixth count of the complaint, which alleged that respondent did not follow the proper procedures when imposing peace bonds, had *not* been proved by a preponderance of the evidence. While respondent "lacked due

---

[25] See MCL 771.1(2) ("In an action in which the court may place the defendant on probation, the court may delay sentencing the defendant for not more than 1 year to give the defendant an opportunity to prove to the court his or her eligibility for probation or other leniency compatible with the ends of justice and the defendant's rehabilitation . . . .").

[26] MCL 771.2(1) provides that, with narrow exceptions, "if the defendant is convicted for an offense that is not a felony, the probation period shall not exceed 2 years."

[27] The master's conclusion was based on the fact that the court files did not indicate that respondent was imposing a delayed sentence, none of the defendants were advised they were receiving a delayed sentence, and many of the delays occurred either before the guilty plea was tendered or after the defendant was sentenced.

13

diligence in not knowing the law" regarding peace bonds, there was no evidence of misconduct.

COUNT 7: INTERFERENCE WITH A CASE

The master found that the seventh count of the complaint, which alleged that respondent had improperly interfered with a case assigned to another judge, had been proved by a preponderance of the evidence. Respondent had a conversation with Roscina Ragland regarding her landlord-tenant case before 12th District Court Judge Michael J. Klaeren. Ragland, described by respondent as a "frequent flyer," showed respondent an order of eviction issued by Judge Klaeren. The previous day, Judge Klaeren had declined to stay the order of eviction as Ragland's counsel requested. Believing that Ragland was being "abused," respondent approached Judge Klaeren and spent 30 to 45 minutes attempting to persuade him to stay the order of eviction. When that effort was unsuccessful, respondent contacted the court's process server, Emmanuel Morales. Respondent told Morales that both Morales and the plaintiff's attorney "could be sued" if the writ were executed. Judge Klaeren held a hearing and issued a second writ because Mr. Morales was "afraid to execute the writ." The master rejected respondent's claim that his activities were indistinguishable from the actions determined not to constitute judicial misconduct in *In re Hultgren*.[28]

---

[28] *In re Hultgren*, 482 Mich 358; 758 NW2d 258 (2008). The master noted that, in contrast to *Hultgren*, respondent contacted the assigned judge directly for the purposes of advocating for Ragland. Additionally, Ragland was represented by an attorney, whereas the defendant in *Hultgren* was an "immigrant with limited language skills." Lastly, in contrast to *Hultgren*, respondent "used the power of his office to stop the writ of eviction by calling the court officer" and telling the officer that he "could be sued if he executed it."

14

## COUNT 8: MISREPRESENTATIONS

The master found that the eighth count of the complaint, which alleged that respondent had made misrepresentations to the JTC, had been proved by a preponderance of the evidence.[29] Specifically, in respondent's response to the 28-day notice provided by the JTC,[30] respondent admitted dismissing tickets without hearings or without authorization from the prosecutor, but stated that the dismissals were "without objection in the end." This statement, according to the master, falsely implied that the dismissals had been done with prosecutorial knowledge and approval. Additionally, respondent's response to the 28-day letter stated that he only dismissed cases "when a dismissal was inevitable" and only when "presented with solid evidence" justifying dismissal. These statements were found to be false because the prosecutors had no knowledge that cases were being dismissed, they would not have consented to dismissal, and the "overwhelming evidence" established that respondent dismissed tickets "with no evidence shown whatsoever."[31]

Similarly, respondent was found to have made false statements in his response to the 28-day letter and his answer regarding abstracts required to be sent to the Secretary of State. Respondent stated that he never altered or deleted an abstract and that court staff, rather than respondent, sent the relevant information to the Secretary of State. This was

---

[29] The master also found that two instances of misrepresentation had not been proved by a preponderance of the evidence.

[30] See MCR 9.207(D)(1).

[31] These cases included "those of his wife, court staff and himself."

found to be a false statement, as respondent acknowledged having the ability to directly access the relevant portion of the court's computer system until his access was revoked because of his misuse. Respondent's response also stated that he merely informed "the [Secretary of State] of changes in the status of a case" and that the reasons given by respondent for the correction of abstracts "have been accurate." These assertions were determined to be false. Respondent admitted at the hearing that the code "sent in error" had been entered "in order to cancel an abstract" that had otherwise properly been transmitted to the Secretary of State. Moreover, there was "abundant proof" that, after defendants pleaded guilty, respondent "stopped, or had stopped, abstracts which were statutorily required to be sent to the [Secretary of State]." The master also noted that respondent "removed or deleted abstracts" sometimes "years after conviction" when, in fact, there had been no change in the status of a case. Indeed, the master found "abundant evidence" showing that respondent "routinely and frequently directly stopped, or had a clerk stop, abstracts for the sole purpose of avoiding negative consequences from the Secretary of State."[32]

Further, at the hearing before the master and in his response to the 28-day letter, respondent stated that he did not order defendants to pay the costs of prosecution because it was illegal and that "most of the cases which included [costs of prosecution] as part of the plea bargain did not qualify." This assertion was found to be false because the "facts admitted at the hearing" showed that respondent ordered costs in cases that did not qualify under the statute and failed to order costs when it was statutorily permissible.

---

[32] The master noted that "[r]espondent acknowledged this repeatedly."

Rather, the master held that respondent's reasons for not ordering costs "had to do with what the defendant could afford and whether the court would get any money" after the costs were paid.

### B. THE DECISION AND RECOMMENDATION OF THE JTC

After hearing oral argument, the JTC issued its decision and recommendation for discipline. The JTC adopted the master's findings of fact "in their entirety," concluding that counts 1, 2, 3, 4, 5, 7, and 8 of the amended complaint had been proved by a preponderance of the evidence. The JTC determined that respondent's misconduct warranted removal from office and "highlight[ed] five particular factual findings"[33] as well as respondent's misleading statements to the commission as providing the basis for the JTC's "conclusion regarding the appropriate sanction." The JTC discussed at length the highlighted findings, but reiterated that it "adopt[ed] and incorporate[d]" the "balance of the master's factual findings" to the extent "not already set forth" in the JTC's decision. The JTC concluded that respondent's misconduct violated Const 1963, art 6, § 30; MCR 9.104(A)(1), (2), and (4); MCR 9.205 and 9.208(B); Canons 1, 2(A), 2(B), 2(C), 3(A)(1), 3(A)(4), and 3(A)(5) of the Code of Judicial Conduct; MCL 257.328(3); MCL 257.907(9); and MCL 257.732. Additionally, the JTC concluded that respondent

---

[33] The five "highlighted" factual findings were (1) respondent's dismissing his four parking tickets without notice to the prosecutor or chief judge, (2) respondent's dismissing the tickets of his wife, staff, and an acquaintance of his wife without notice to the prosecutor or chief judge, (3) respondent's pattern of improper dismissals without hearings or notice to the prosecutor, (4) respondent's pattern of interfering with abstracts sent to the Secretary of State's office, and (5) respondent's direct interference with a case pending before a different judge.

violated the disqualification rules in MCR 2.003(C) and Canon 3(C) in failing to recuse himself from cases involving himself and his wife.

In determining the appropriate sanction, the JTC assessed the factors set forth in *In re Brown*.[34] Finding that respondent's misconduct implicated six of the seven *Brown* factors, the JTC concluded that a severe sanction was warranted. In addition to the *Brown* factors, the JTC noted that respondent had a prior history of judicial misconduct. In 1998, respondent received a public censure for misconduct wherein he "intentionally manipulated fines and costs in an effort to punish the City of Jackson for its actions involving the pensions of certain city employees."[35] The JTC noted that the present case was similar to the prior case of misconduct in that "respondent kept engaging in wrongful behavior after the Chief Judge directed him to stop." Given respondent's "deliberate and repeated decisions to circumvent the judicial process," the JTC concluded that respondent was "unfit to sit as a judge" and therefore recommended his removal. The JTC also asked that respondent be assessed costs in the amount of $24,934.19 for his intentional misrepresentations.

## II

The power to discipline a judge resides exclusively in this Court, but it is exercised on recommendation of the JTC.[36] This Court reviews de novo the factual

---

[34] *In re Brown*, 461 Mich 1291, 1292-1293 (1999).

[35] See *In re Justin*, 456 Mich 1220 (1998). In that matter, respondent entered into a consent agreement with the JTC for a public censure.

[36] Const 1963, art 6, § 30.

18

findings and the recommendations of the JTC.[37]  The proper standard of proof to be used in judicial tenure cases is a preponderance of the evidence.[38]

On review of the entire record, we agree with and adopt in full the factual findings of the master and the JTC.  Furthermore, we adopt the disciplinary recommendation of the JTC.  It is fair to say that the common themes running throughout respondent's substantiated acts of misconduct are a calculated disregard for the law and an intentional effort to undermine the judicial process, as deemed warranted or expedient by the respondent.  Such misconduct evinces an unacceptable disregard for the role of judge as well as disdain for due process and the right of parties to a fair hearing.

Respondent's actions are completely antithetical to the privilege of being a judge and more than adequately justify his removal from office.

To begin with, respondent's misconduct in fixing his own tickets and the tickets of his wife and staff, standing alone, is *more* than sufficient to justify his removal from office.  Respondent used the authority of his office to bypass the normal adjudicatory process and permit wrongdoers to evade responsibility for violating the law.  Respondent summarily dismissed four tickets issued to himself, five tickets issued to his wife, and two tickets issued to members of his staff.  Respondent acknowledged that he dismissed these tickets, but claimed that the only misconduct he committed when doing so was failing to recuse himself from the cases.  Respondent's assertion presumes that, apart from respondent's failure to recuse himself, the cases were otherwise properly resolved

---

[37] MCR 9.225; *In re Somers*, 384 Mich 320, 323; 182 NW2d 341 (1971).

[38] MCR 9.211(A); *In re Loyd*, 424 Mich 514, 521; 384 NW2d 9 (1986).

19

through the judicial process and the dismissals were conducted in accordance with Michigan rules and procedures, as one would ordinarily expect when resolving a legal dispute. This presumption is, quite simply, false.

In 1859, this Court described "judicial power" as "the power to hear and determine controversies between adverse parties, and questions in litigation."[39] The fundamental purpose in resolving such controversies is quite simple: the fair ascertainment of the truth.[40] While it is axiomatic that respondent could not sit as a neutral arbiter over his own cases, the simple fact of the matter is that respondent's actions were deliberately calculated to *ensure that no court proceedings would ever be held*. When respondent fixed his own tickets, for example, he apparently provided an "explanation"[41] to himself and, having found his own explanation credible, simply dismissed his tickets.[42] The

---

[39] *Daniels v People*, 6 Mich 381, 388 (1859).

[40] *People v Johnson*, 356 Mich 619, 621; 97 NW2d 739 (1959) (noting that a criminal trial is "an inquiry primarily directed toward the fair ascertainment of truth").

[41] There is absolutely no statutory authority permitting a judge to dismiss a case "after explanation." Respondent cites MCL 600.8715(3), MCL 600.8809(2)(b), MCL 600.8811, and MCL 600.8815 in support of his claimed authority. However, each of these statutory provisions concerns a defendant's ability to *admit responsibility* for his civil infraction "with explanation." While a defendant's explanation may serve to mitigate the sanction imposed, see MCL 600.8715(4) and MCL 600.8815(4), a wholesale *dismissal* of the case after a defendant has admitted responsibility for the violation does not appear to be included among the available "sanctions." See MCL 600.8727(2); MCL 600.8827(2).

[42] Ostensibly, the "explanation" respondent provided to himself was that he was not responsible for his parking tickets because someone else was driving his automobile at the time each ticket was issued. However, even this portion of respondent's excuse is without legal merit. Under Michigan law, the owner of the vehicle "is prima facie responsible" for civil parking infractions, MCL 257.675c(1), and may only assert an "affirmative defense" if the vehicle was "in the possession of a person whom the owner

20

entire judicial process was consciously sidestepped. There was no public hearing, no opposing party present, no evidence presented, no cross-examination of witnesses, and none of the other mechanisms that provide a fair ascertainment of the truth.[43] In short, respondent deliberately abused the judicial power with which he was entrusted to prevent the truth of his own wrongdoing from being discovered. While respondent claimed that dismissing his own tickets "provided the least expensive way of handling the situation for the court," it is patently obvious that dismissing his own tickets provided respondent the least expensive resolution *for himself.*

Respondent's intentional abuses of judicial power to benefit himself, his spouse, and his staff are inconsistent with his oath of office and deleterious to the integrity and honor of the judiciary.[44] Respondent's belief that he is above the law, and not "as subject to the law as those that appear before" him, renders him unworthy of holding judicial office.[45]

---

had not knowingly permitted to operate the vehicle," MCL 257.675c(2). The statute applies to both statutory violations and violations of "a local ordinance prohibiting or restricting the stopping, standing, or parking of a vehicle . . . ." MCL 257.675c(1).

[43] At the end of his testimony before the JTC, respondent acknowledged that he "should have" presented his defense to a visiting judge.

[44] The oath of office respondent took requires him to "solemnly swear" to support the Constitution and to "faithfully discharge the duties of" a district court judge. See MCL 168.467j; Const 1963, art 11, § 1.

[45] *In re Noecker*, 472 Mich 1, 13; 691 NW2d 440 (2005) (holding that a judge's conduct "seriously undermined the public's faith that judges are as subject to the law as those who appear before them" and justified removal from office).

While respondent's misconduct in fixing his tickets and the tickets of his wife and staff warrants removal from office, respondent's misconduct was regrettably not so limited. The record shows that on numerous occasions, respondent dismissed citations and misdemeanor charges for select defendants without a hearing or notice to the prosecutor.[46] Respondent admits dismissing cases after "discussing the matters in the hallway" with a defendant and without advising the prosecuting attorney because he believed this manner of case resolution provided "optimum, convenient service."[47] Respondent provides no authority for this provision of "optimum, convenient service" because, quite obviously, none exists. As discussed, the core of "judicial power" involves the power to hear and determine controversies between adverse parties. Respondent's method of dismissing cases after having a discussion with only one side of a controversy is not a valid exercise of the judicial power; rather, it is a *perversion* of judicial power. Apparently, respondent believed that providing what he considered "optimum, convenient service" trumped the law and the canons of judicial ethics and gave him license to do away with the truth-finding process *entirely*.[48]

---

[46] While the citations and charges were mostly dismissed "after explanation," in two instances respondent ordered cases "dismissed in the interest of justice." Respondent provided no rationalization for this alternative means of dismissing criminal charges.

[47] Respondent also testified that he dismissed charges in one case so that he would not have to set the case for "pretrial and trial." In another case, respondent dismissed a charge because despite the fact that the defendant readily admitted his guilt to the offense, "the township prosecutor had already departed from the building."

[48] Interestingly, while some citizens received the "optimum, convenient service" of having their tickets and charges summarily dismissed, other citizens were forced to endure the inconvenience and burden of countless adjournments and delays, requiring

22

Additionally, respondent felt compelled to "improve upon" validly entered plea agreements between the prosecutor and defendants, even going so far as to dismiss cases or counts *after* a defendant had tendered a guilty plea to the charges. Respondent has identified no authority that would permit him to dismiss criminal charges in this manner. Indeed, such actions implicate the separation of powers principles[49] articulated in Const 1963, art 3, § 2.[50] Also, without informing the prosecutor, respondent failed to follow

---

frequent court appearances. It is unclear how this latter group fit into respondent's theory of providing "optimum, convenient service."

Moreover, respondent's belief that expediency could trump the rule of law had repercussions for the entire 12th District Court. When citizens who had received "optimum, convenient service" in respondent's courtroom later found themselves in another judge's courtroom, where the rule of law, not "optimum, convenient service," was the guiding principle, these citizens sometimes became confused and angry. As the chief judge of the court explained:

> These people were indignant with us when we imposed a sentence, because [respondent] didn't do this. Why are you doing this to me? Why are you sentencing me? Because [respondent] didn't do this. It was a different kind of justice in that courtroom than the justice that was received by or administered by the other three judges. And, yes, there were repercussions; there were people that were extremely angry, people who questioned our authority for doing what we were doing.

[49] As this Court has explained,

> [t]he power to determine whether to charge a defendant and what charge should be brought is an executive power, which vests exclusively in the prosecutor. The exercise of judicial power over the discharge of the prosecutor's duties "is limited to those activities or decisions by the prosecutor that are unconstitutional, illegal, or ultra vires." [*People v Gillis*, 474 Mich 105, 141 n 19; 712 NW2d 419 (2006) (citations omitted).]

[50] That section provides: "The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall

plea agreements that required the payment of costs. While respondent claims that the imposition of such costs was illegal, we agree with the master that the veracity of respondent's claimed belief is belied by his inconsistent pattern of ordering costs. Respondent's acts of failing to order costs as part of the plea agreement in some cases in which they were explicitly permitted by law and ordering costs in other cases in the complete absence of statutory authority undercut any claim that respondent *legitimately* believed that the imposition of costs was illegal.[51]

Respondent's multitudinous acts of deleting or altering the abstracts of court records to be sent to the Secretary of State as MCL 257.732 requires or stopping them from being sent also provides a basis for removing respondent from office. By respondent's own admission, he ordered that abstracts required by law to be sent not be sent, removed or deleted validly entered abstracts, and entered false information into the system to accomplish the removal.[52] However, the law is absolutely clear regarding respondent's actions: they are utterly and categorically *prohibited*. The Legislature has indicated that the "failure, refusal, or neglect of a person to comply" with the reporting requirements of MCL 257.732 "constitutes misconduct in office and is grounds for

exercise powers properly belonging to another branch except as expressly provided in this constitution."

[51] Moreover, if respondent believed that a term in the plea agreement was illegal, he should have declined to accept the plea agreement, permitting the prosecutor and defendant to return to the negotiating table. See MCR 6.302(A).

[52] Because each abstract is "entered upon the master driving record of the person to whom it pertains," MCL 257.732(15), respondent's acts had the effect of clearing or improving the master driving record of the lucky beneficiaries of respondent's munificence.

24

removal from office."[53]  Moreover, subject to exceptions not applicable here, "a court shall not order expunction of any violation reportable to the secretary of state . . . ."[54]

Respondent argues that because MCL 257.732 imposes the duty to forward court record abstracts on "municipal judge[s] and each clerk of a court of record," the statute is "not applicable to him" because he is neither a municipal judge nor a court clerk. However, while MCL 257.732(1) does indicate that "the municipal judge or clerk of the court of record" must forward the court record abstracts to the Secretary of State, the scope of MCL 257.732(14) is not so circumscribed: it applies to "a person," a category that undeniably includes respondent.[55]  Moreover, the testimony of the chief judge of the 12th District Court indicated that respondent was the only judge in that court to make entries into the court's computer system.[56]  The evidence also established that respondent had ordered his staff to stop the entry of abstracts in violation of MCL 257.732.  It simply provides no defense that respondent elected to access the system instead of court staff or ordered court staff to violate the law on his behalf.  Respondent's unabashed and willful

---

[53] MCL 257.732(14).

[54] MCL 257.732(22).

[55] Even if we were to conclude that MCL 257.732 was not directly applicable to respondent, there is no reason this Court could not take notice of the statute and consider the Legislature's pronouncement regarding conduct constituting "misconduct in office" in determining whether respondent committed judicial misconduct as well as the appropriate sanction.

[56] The chief judge also testified that respondent was the *only* judge who had access to the "[Secretary of State] systems" and could send information to the Secretary of State asking that "abstracts be removed."

violation of the statutory requirements provides further support for the sanction of removal.

Finally, respondent has been determined to have lied under oath during the JTC proceedings. This is entirely incompatible with judicial office and warrants removal. We summarize three instances of respondent's lying under oath.

During respondent's testimony, he reiterated that the reason he did not order a defendant to pay the costs of prosecution as part of a plea bargain was that such costs were "not authorized" by MCL 769.1f. The evidence adduced at the hearing established that this statement was a falsehood and that statutory authority was not respondent's motivating consideration in determining whether to order costs.

The assistant city attorney for the city of Jackson testified that when his office became aware that respondent was not abiding by plea agreements, it began monitoring respondent's compliance with the city's plea agreements by tracking approximately 130 cases between 2008 and 2009. The result of the monitoring revealed that of the cases surveyed in which there was no statutory authority to order the payment of costs, respondent ordered costs in 55 percent of them. The act of ordering costs in a *majority* of the cases for which there was no statutory authority to do so belies any claim that statutory authorization was respondent's foremost consideration.

Furthermore, in describing why he did not impose the costs as part of a plea agreement, respondent stated:

> And part of my problem is that, you know, I can only assess [a] total amount of so much, and if 50 or . . . 100 or $200 goes into costs of prosecution, that means, with what's going to the state, that there is not a whole lot that is going to go to the county, and, of course, the county is the

one that supports the court. And it seems a challenge to me, particularly in this economic climate with a number of people that we deal with and their financial situation that I can—especially since these costs of prosecution are not related very much to the actual costs to the municipality.

During the hearing, respondent was serially impeached with dozens of cases in which he ordered the payment of costs despite the glaring absence of statutory authority. While respondent testified that he did not remember the specific details of the cases, he did acknowledge that he ordered the payment of costs without statutory authority because (1) "there was substantial negotiation between the township prosecutor and the defense attorney," (2) he "went along" with the imposition of costs since "the defendant was willing to pay money in order to have the matter dismissed," and (3) ordering the costs of prosecution was "justified" by the "benefits" a defendant received by a favorable plea bargain. Respondent testified that there were "times" when it was "easier" to charge both court costs *and* the costs of prosecution, while in other cases it was "very hard to do that." The record reveals the following colloquy:

> *The Master*: So if I understand what you're saying, it didn't have to do with the philosophical belief or the legal standard, but it had to do with the defendant's ability to pay?
>
> *Respondent*: That was—that was a way—that was a situation where it was easier for me to go along with my fellow judges.
>
> *The Master*: Because the defendant couldn't pay?
>
> *Respondent*: Because of the fact that the defendant, if the defendant had been convicted of all of the charges and had to pay fines and costs on all of the charges, they probably would have ended up paying more than they would have paid being assessed for one count and also having to pay some costs of prosecution.

*  *  *

27

[*The Examiner*]: . . . So if I understand your answer to the judge, despite the fact you say it's illegal on these cases, economic factors caused you to violate what you say is the law; is that correct?

*Respondent*: Certainly my concern about where fines and costs ultimately ended up affected my—my determination, and certainly was not authorized.

Additionally, there were many cases in which respondent *did not order* payment of the costs of prosecution as part of a plea agreement, even though MCL 769.1f specifically authorizes it. Respondent testified under oath that he did not order costs in these cases because the amounts were "excessive" and therefore not "appropriate" for him to authorize. Respondent further testified that the costs of prosecution had to be "justified and documented." We conclude that these statements were also false. Respondent both ordered and failed to order costs as part of a plea agreement when the agreed-upon amounts were *identical* and failed to order the costs of prosecution when the amount contained in the plea agreement was substantially less than the amount in another. Additionally, respondent ordered costs in the complete absence of justification or documentation, contradicting any claim that costs had to be "justified and documented."

Respondent acknowledged that the Jackson city attorney would generally permit a defendant charged with operating a motor vehicle while intoxicated to plead guilty of operating a motor vehicle while visibly impaired. As part of those agreements, defendants often agreed to pay $200 for the costs of prosecution. The assistant city attorney testified that respondent failed to order costs in 78 percent of the drunk driving cases in which costs were part of the plea agreement during the relevant tracking period.

28

Most of those cases involved costs in the amount of $200. However, in addition to failing to order costs in the amount of $200, respondent also failed to order costs when the amount in the plea agreement was much lower, such as $100 or $50. In each case in which respondent *ordered* costs as part of an agreement reducing the charges from operating while intoxicated to operating while visibly impaired, respondent uniformly assessed costs of $200—an amount respondent's testimony indicated was "excessive." Moreover, respondent acknowledged at the hearing that he did not require *any* type of documentation or proof on those occasions when he ordered costs pursuant to a plea agreement.

Lastly, while under oath, respondent indicated that his practice of "talking to people" and dismissing their cases depended on defendants' "having actual proof that their position was right[.]" However, this was a blatantly false statement, and one need look no further than respondent's actions dismissing the tickets of his court staff, who received citations for speeding, and his spouse, who received three citations for speeding and a citation for disobeying a stop sign. Respondent's spouse and staff did not, in fact, provide "actual proof" justifying dismissal of their tickets, and respondent, by dismissing the tickets himself without a hearing, "conveniently" precluded the officers who issued the tickets and the prosecutor from offering proof of the violations. Moreover, respondent dismissed a wide variety of cases that are simply not amenable to a defendant's providing "actual proof" of innocence, including, for example, speeding or driving with a suspended license. It is unclear what "actual proof" *could* be provided under these circumstances. Even for those cases in which it *was possible* to provide

"actual proof," respondent was impeached by court transcripts establishing that he dismissed cases without seeing "actual proof" of insurance.

Because the record fully supports the finding that respondent lied under oath, the appropriate sanction is removal from office. Respondent's act of lying under oath categorically renders him unfit for office. As this Court has noted,

> [o]ur judicial system has long recognized the sanctity and importance of the oath. An oath is a significant act, establishing that the oath taker promises to be truthful. As the "focal point of the administration of justice," a judge is entrusted by the public and has the responsibility to seek truth and justice by evaluating the testimony given under oath. *When a judge lies under oath, he or she has failed to internalize one of the central standards of justice and becomes unfit to sit in judgment of others.*
>
> Certainly, Judicial Tenure Commission proceedings are intended to be remedial, not penal. The vast majority of misconduct found by the Judicial Tenure Commission is not fatal; rather, it reflects oversight or poor judgment on the part of a fallible human being who is a judge. *However, some misconduct, such as lying under oath, goes to the very core of judicial duty and demonstrates the lack of character of such a person to be entrusted with judicial privilege.*
>
> *. . . Lying under oath, as the respondent has been adjudged to have done, makes him unfit for judicial office.*[57]

Finally, we note that respondent's other acts of substantiated judicial misconduct, while quite serious, might not warrant removal from office if taken in isolation. However, the inescapable truth is that respondent's other substantiated acts of misconduct, as well as his previous disciplinary history, *are not isolated*, but are part and

---

[57] *Noecker*, 472 Mich at 17-18 (YOUNG, J., concurring) (emphasis added; citations omitted).

parcel of respondent's pervasive pattern of misconduct and his calculated disregard for the law. As the master succinctly concluded, "[r]espondent has repeatedly and intentionally demonstrated a defiant lack of respect for the rule of law and the separations of powers." Respondent's clear disregard for the rule of law is incompatible with a judge's duty to uphold the law and renders him unfit for judicial office.

We order that respondent be removed from office. Additionally, pursuant to MCR 9.205(B), we order the JTC to submit a bill of costs, itemizing what costs may be attributed to the conduct or statements of respondent that permit this Court to impose "costs, fees, and expenses incurred by the [JTC] in prosecuting the complaint." Pursuant to MCR 7.317(C)(3), the clerk is directed to issue the judgment order forthwith.

Robert P. Young, Jr.
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra


CAVANAGH, MARILYN KELLY, and HATHAWAY, JJ. We concur in the result only.

31